2013 ND 35

Terence BARRETT and Rachel
Barrett, Plaintiffs and
Appellants

v.

Harry GILBERTSON, d.b.a., Harry
Gilbertson Construction,
Defendant and Appellee.

No. 20120279.

Supreme Court of North Dakota.

Feb. 26, 2013.

David A. Garaas, DeMores Office Park, Fargo, N.D., for plaintiffs and appellants.

Timothy P. Hill, Fargo, N.D., for defendant and appellee.

SANDSTROM, Justice.

[¶ 1] Terence and Rachel Barrett appeal from a judgment dismissing their claims against Harry Gilbertson, doing business as Harry Gilbertson Construction, in a contract dispute. The Barretts argue the court erred in dismissing their breach of contract claims related to the construction of their house and the court abused its discretion in denying their motion for attorney's fees. We affirm.

I

[¶ 2] On May 4, 2007, the Barretts and Gilbertson entered into a contract for the construction of a house and the sale of property to the Barretts. The Barretts provided Gilbertson with blueprints of the house they wanted Gilbertson to build, and the contract required the house "be erected in accordance with the approved plans and specifications of record...." After construction of the house was largely complete, the Barretts raised some concerns about the construction, and in early October 2007, the Barretts and Gilbertson reached an agreement entitled "Final Settlement Offer," which reduced the purchase price of the property. On October 8, 2007, the parties closed on the sale of the property.

[¶ 3] In July 2010, the Barretts sued Gilbertson for breach of contract, alleging Gilbertson failed to construct the house in a workmanlike manner and according to the blueprints and seeking over $40,000 in damages. The Barretts claimed the house was not constructed in accordance with the blueprints because the laundry room was smaller than the space indicated on the blueprints and the below-grade space was only a crawlspace and not a full-depth basement with a ceiling height of at least seven feet. The Barretts also alleged Gilbertson was required to fix various construction "discrepancies" or defects under the warranty provision of the contract and he failed to make any of the requested repairs. Gilbertson filed a counterclaim, seeking damages for defamation and emotional distress. Gilbertson's counterclaims were later dismissed.

[¶ 4] After a court trial, the district court dismissed the Barretts' claims, finding Gilbertson did not breach the contract, any claims for breach of contract related to

the below-grade space and laundry room were clearly extinguished by the parties' settlement prior to closing on the property, the Barretts failed to give Gilbertson an opportunity to fix any defects, and the evidence offered in support of the alleged damages was either insubstantial or in direct conflict with more credible. evidence. A judgment was entered, dismissing the Barretts' claims with prejudice. The Barretts moved for attorney's fees related to Gilbertson's counterclaims. Gilbertson also moved for attorney's fees. The court denied both parties' motions.

[¶ 5] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. The appeal was timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–27–01.

II

■ [¶ 6] The Barretts argue the district court erred in finding they did not establish Gilbertson breached the contract by failing to build the below-grade space according to the blueprints. They claim they contracted for a full-depth basement but the below-grade space that was built is considered a crawlspace because it is only approximately six feet two inches in height.

■ [¶ 7] "A breach of contract is the nonperformance of a contractual duty when it is due." *WFND, LLC v. Fargo Marc, LLC*, 2007 ND 67, ¶ 13, 730 N.W.2d 841. To establish a breach of contract, the party asserting the breach must prove the existence of a contract, a breach of the contract, and damages which flow from the breach. *Id.* Whether a party has breached a contract is a finding of fact subject to the clearly erroneous standard of review. *Id.* A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support the finding, or if this Court is convinced, on the basis of the entire record, that a mistake has been made. *Id.* We do not reweigh conflicting evidence, and we give due regard to the district court's opportunity to judge the witnesses' credibility. *Cavendish Farms, Inc. v. Mathiason Farms, Inc.*, 2010 ND 236, ¶ 20, 792 N.W.2d 500.

[¶ 8] The contract included a provision addressing the requirements for the construction of the house:

[Gilbertson] shall, at its own cost and expense, erect and complete a one family dwelling on the premises substantially similar to the building specifications blueprint on exhibit by [Gilbertson] and attached and incorporated herein by reference as EXHIBIT "A". Such dwelling shall be construction [sic] in accordance with the requirements as to the materials and workmanship of the municipality wherein it is or will be located, and with the requirements of the lending institution which shall make the mortgage loan hereinafter set forth. Such dwelling shall be erected in accordance with the approved plans and specifications of record with [Gilbertson]. [Gilbertson] reserves the right to make such changes or substitutions, or both, in the construction as may be required, authorized, or approved by such lending institution or by governmental agencies having jurisdiction thereof.

The blueprints the Barretts provided to Gilbertson showed a below-grade space, significantly smaller than the main floor of the house, labeled "storage." The blueprints showed a stairway leading into the area with lines indicating steps. The blue-

prints did not specify the height of the walls, a minimum headroom, or the height of the steps.

[¶ 9] The district court found Gilbertson's construction of the below-grade space was not a breach of the contract:

> Much of the dispute focuses on the headroom in the below grade storage/mechanical space. [The Barretts] claim they contracted for, but did not receive, a full depth basement. Conceding it would not be feasible to correct this condition, damages are based on a diminution in value theory. There are multiple shortcomings in the evidence offered to prove this portion of the claim.
>
> Collectively, the contract documents are short in detail. As is typical with projects of this nature, changes in the design occurred over time and were not well documented. There is nothing in writing that specifies a minimum headroom. However, the testimony establishes that the design and dimensions of the below grade space were discussed on numerous occasions by Rachel and Gilbertson. The same is true of the laundry area. Based on all the evidence, I find that Gilbertson proceeded in accordance with the resulting understandings, and no breach occurred.[1]
>
> . . . .

---

1 Rachel may well have been confused about some of the specifics, but contracts are based on mutual understandings, not unilateral misunderstandings. Furthermore, as Rachel repeatedly testified, her sole expectation was a space that could be used for storage. That expectation has been met.

[¶ 10] Contracts are construed to give effect to the parties' mutual intent as it existed at the time of contracting.

N.D.C.C. § 9–07–03. The parties' intent is ascertained from the writing alone whenever possible. N.D.C.C. § 9–07–04. "The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." N.D.C.C. § 9–07–09. The circumstances under which the contract was formed and the matter to which it relates may be considered. N.D.C.C. § 9–07–12. We have explained the standards for interpreting a contract:

> Contracts are construed to give effect to the parties' mutual intent at the time the contract was formed, and if possible, we look to the writing alone to determine the parties' intent. Interpretation of a contract is a question of law, if the parties' intent can be determined from the language of the contract alone. Whether a contract is ambiguous is a question of law, which we review independently. A contract is ambiguous if rational arguments can be made for different interpretations. If a contract is ambiguous, extrinsic evidence may be considered to determine the parties' intent, and the terms of the contract and the parties' intent become questions of fact.

*Langer v. Bartholomay*, 2008 ND 40, ¶ 12, 745 N.W.2d 649 (citations omitted). The court may also consider "proof of the existence of a separate oral stipulation or agreement as to any matter on which the written contract was silent, and which is not inconsistent with its terms, if from the circumstances of the case, the court infers that the parties did not intend the document to be a complete and final statement of the whole of the transaction between them." *Delzer v. United Bank of Bis-*

*marck*, 459 N.W.2d 752, 755 (N.D.1990); *see also Langer*, at ¶ 14; *Felco, Inc. v. Doug's North Hill Bottle Shop, Inc.*, 1998 ND 111, ¶¶ 18–19, 579 N.W.2d 576. "[W]here an agreement is partly written and partly in parol, that part which is in parol and is not mentioned or covered in the written contract may be proven by competent testimony." *Delzer*, at 755.

[¶ 11]   Here, the contract does not specify the height of the below-grade space. The Barretts contend Gilbertson did not build the below-grade space in conformance with the blueprints, because the blueprints showed stairs with thirteen risers from floor to floor, the average riser height is 7.5 inches, and if the plan had been followed, the space would have normal height dimensions for a basement with sufficient headroom. Although the blueprints indicate steps, the blueprints did not indicate the height of each step. There was evidence during the trial about the average height of a stair riser and the maximum height under the building code and that the height can vary, but there was no evidence of a minimum height or a required height. The written contract alone does not require a full-depth basement with normal height dimensions.

[¶ 12]   There was evidence the parties did not intend for the contract to be a complete and final statement of the terms for the construction of the house, and there were additional terms concerning the dimensions of the below-grade space that were consistent with the contract. Both of the Barretts testified they believed the below-grade space would have eight-foot walls, and Rachel Barrett's notes from a January 2007 meeting with Gilbertson indicate "basement = 8ft wall." There was evidence the below-grade space from the concrete floor slab to the bottom of the

trusses is approximately six feet two inches. However, Gilbertson testified the walls are eight-foot walls because the walls are seven feet ten inches tall, which is the industry standard for an eight-foot wall. He testified the space does not have normal basement height dimensions because the Barretts wanted the rest of the house to be a slab-on-grade foundation and they did not want any steps into the house or throughout the house except going down into the lower level, and to accommodate the Barretts' requests, the trusses had to hang down from the top of the wall instead of resting on top of the wall, which would have allowed for more headroom. Gilbertson testified he explained what the below-grade space would look like to Rachel Barrett and he showed her a house he built with a similar design. The Barretts also testified they planned to use the below-grade space for storage and mechanical. The evidence supports the court's finding that Gilbertson built the house in accordance with the contract and the parties' understanding and that no breach occurred.

[¶ 13]   To the extent the Barretts also argue the district court erred in finding Gilbertson did not breach the contract regarding the size of the laundry room, the evidence supports the court's finding. Gilbertson admitted the laundry room is smaller than the space designated for the laundry room in the blueprints, but he testified he told Rachel Barrett there would have to be a change in the design to accommodate duct work for heating and air conditioning and she would have to lose space in either the laundry room or the master bathroom. He testified she chose to put the duct work in the laundry room. Rachel Barrett testified Gilbertson explained that the laundry room had to be

shortened from the dimensions in the blueprints.

[¶ 14] Furthermore, the district court also found the parties' settlement before closing on the property extinguished the claims:

> Even if there was a breach, any resulting claim was clearly extinguished as a result of the settlement reached just prior to closing. By this time construction was substantially completed. [The Barretts] must be charged with full knowledge of the size of the mechanical/storage and laundry areas. According to the witness (Kuzas), the headroom issue was clearly on the table. Terence testified that he viewed Gilbertson's proposed adjustments to the purchase price as a "final settlement offer." He went on to indicate that this offer was carefully considered before [the Barretts] "decided to accept it." This evidence was convincing, and establishes that the written agreement (Exhibit 208) was mutually intended to resolve any claim the dimensions of the structure did not conform to the contract.

[¶ 15] " 'In North Dakota, the law looks with favor upon compromise and settlement of controversies between parties, and where the settlement is fairly entered into, it should be considered as disposing of all disputed matters which were contemplated by the parties at the time of the settlement.' " *Kuperus v. Willson*, 2006 ND 12, ¶ 10, 709 N.W.2d 726 (quoting *Vandal v. Peavey Co.*, 523 N.W.2d 266, 268 (N.D.1994)). A settlement takes on the character of a contract between the parties and is final and conclusive. *Kuperus*, at ¶ 10.

[¶ 16] There was evidence the parties signed a document entitled "Final Settlement Offer" a few days before closing on the property. The document showed the purchase price of the property under the terms of the contract was $344,000, but under the settlement the Barretts received credit for certain unspent allowance amounts, Gilbertson agreed to pay some of the expenses incurred, the realtor agreed to waive her commission, and the final price of the property after these amounts were deducted was $326,882.35. Terence Barrett testified he and Rachel Barrett met with Gilbertson, their realtor, and William Kuzas, Gilbertson's business banker, on September 28, 2007, to discuss problems the Barretts had with the property and to convince the Barretts to close on the property. He testified he and Rachel Barrett brought blueprints, documents, and photographs to the meeting, they talked about allowances and items they believed were to be provided under the terms of the contract but which they did not receive, and they went through a list of the items they wanted to be reimbursed for and deducted from the price of the house. He testified he knew about the basement issue before closing on the property. Kuzas testified the height of the below-grade space was one of the issues discussed during the settlement meeting. Kuzas's notes from the meeting also showed the height of the below-grade space was one of the issues discussed during the meeting. Kuzas also testified Terence Barrett discussed the height with him again on October 1, 2007, and Terence Barrett said the issue was his misunderstanding and Gilbertson had explained to Rachel Barrett what the elevation of the below-grade space would have to be in order to build the house according to the blueprints. Kuzas's notes from the meeting also state Terence Barrett indicated that if Gilbertson agreed to reduce the

price by an additional amount "they would accept this as a settlement and proceed in closing the transaction." Terence Barrett testified Gilbertson was going to present a final settlement offer for the price of the house after making deductions for the items discussed at the meeting. Furthermore, the Final Settlement Offer provided:

This is a final offer. The closing is to be Monday, October 8, 2007. If offer is not accepted and closing is not October 8th this offer will be considered null and void and the construction contract along with the addendums will be enforced.

Gilbertson and the Barretts signed the settlement and closed on the property a few days later. The evidence supports the court's findings, and we conclude the settlement disposed of any claims that the construction of the house did not conform to the contract.

[¶ 17] The Barretts failed to establish Gilbertson breached the terms of the contract. Furthermore, the settlement disposed of any claims the Barretts had with the house relating to the height of the basement and the size of the laundry room. We affirm the district court's decision denying the Barretts' claim for breach of contract relating to the construction of the basement and laundry room.

III

[¶ 18] The Barretts argue the district court erred in finding they did not establish a breach of contract by Gilbertson concerning construction defects. The Barretts contend Gilbertson had a duty to fix any work or materials that were defective within twelve months from the closing date, and they claim there was a long list of defects that Gilbertson failed to repair, including cracks in the sheetrock and

problems with baseboards and interior and exterior doors. The purchase agreement provides, "[Gilbertson] shall promptly correct any work or materials failing to comply with the specifications of the blueprints or which are otherwise defective so long as the [sic] reported to [Gilbertson] in writing within 12 months from the Date of closing."

[¶ 19] The district court found Gilbertson agreed to correct any defective work within twelve months of the closing date, but found the Barretts' claim failed:

The remaining claims have to do with alleged deficiencies or "discrepancies" in the construction details. Under the terms of the written contract, Gilbertson did agree to correct any defective work or materials reported within 12 months of the closing. It was clearly understood by both parties that this warranty would not be extinguished by the settlement otherwise reached prior to closing. Nonetheless, this portion of the claim also fails for multiple reasons.

Although plaintiffs have been highly critical of Gilbertson's work, most of their specific complaints have more to do with the nature of materials rather than workmanship. Wooden trim pieces expand and contract. Foundations settle. The inspector hired by plaintiffs (Sakry) concluded "workmanship was quite satisfactory." The appraiser (Triebwasser) described overall quality and craftsmanship as "good," comparable to most houses in the same price range. The defense expert (Knoblich [sic]) testified that his inspection disclosed only minor cosmetic conditions that could be easily remedied, and were largely unavoidable due to the nature of construction materials. This credible and consistent testimony does not support plaintiffs' claims.

Furthermore, *to the extent defects were reported, it is undisputed that Gilbertson was never given an opportunity to fix them.* That was his sole obligation under the terms of the contract. "If one party prevents the other's performance, it excuses the performance and provides a defense in a suit for breach by such non-performance." *Barnes v. St. Joseph's Hosp.*, 1999 ND 204, ¶ 16, 601 N.W.2d 587.

(Emphasis added.)

[¶ 20] There was evidence some of the "discrepancies" the Barretts raised were minor cosmetic issues that were related to environmental conditions and the materials selected. The Barretts' inspector, Donald Sakry, testified Terence Barrett pointed out some of what he thought were flaws in the construction, but the inspector thought the workmanship was quite satisfactory. The appraiser, William Triebwasser, testified the overall craftsmanship was good, he did not see any problems with the craftsmanship, and some of the alleged defects were normal and would not affect the appraisal. Gilbertson's home inspector, Lars Knobloch, testified some of the Barretts' complaints were legitimate but a lot of the issues were cosmetic and were typical. Knobloch testified he thought the workmanship was very good, there were only a couple of things that should be repaired, and those things could be easily repaired. He also testified the issues were minor and most people would not do anything about them because these types of issues are expected on account of the geological conditions and the materials used, including wood which normally shrinks and cracks with time. The evidence supports the court's findings.

[¶ 21] Moreover, to the extent there were defects Gilbertson was required to repair under the terms of the contract, his nonperformance is excused because the Barretts prevented him from making the repairs. "[E]ach party to a contract impliedly agrees not to prevent the other party from performing and not to render performance impossible." *Barnes*, 1999 ND 204, ¶ 16, 601 N.W.2d 587. When one party prevents the other party's performance of a term of a contract, it excuses the nonperformance and provides a defense in a suit for breach by the nonperformance. *Id.* The Barretts were required to allow Gilbertson to correct the defective work or materials. The district court found the Barretts did not give Gilbertson an opportunity to fix the alleged defects. The Barretts claim their duty was excused and they acted reasonably when they refused to risk further injury by allowing Gilbertson to make any repairs.

[¶ 22] There was evidence the Barretts initially identified 32 "discrepancies," but that number later increased to 81 "discrepancies." The Barretts sent Gilbertson multiple letters between December 2007 and May 2008 about the "discrepancies," requesting Gilbertson advise them of how he planned to fix the problems. Initially, Gilbertson responded to the Barretts' letters and advised the Barretts he was willing to go through the house and address their concerns. Gilbertson testified he contacted the Barretts by phone, through the mail, and through his attorney at the Barretts' request, and he offered to fix the problems they identified multiple times. He testified he believed it would take approximately three days to fix the identified defects, but he was never allowed into the house to complete any repairs. There was evidence the Barretts sent Gilbertson several letters about the alleged "discrepancies," requested a specific remedy for some

of the discrepancies, and requested Gilbertson explain in detail how he planned to fix the other discrepancies. Gilbertson testified that most of the problems could be fixed in multiple ways and he planned to try each method until the Barretts were satisfied with the results. Gilbertson sent the Barretts letters dated September 23, 2008, and October 13, 2008, advising them he was still willing to address the items on their list and he wanted to arrange a time to be allowed to enter the home to complete the repairs. Terence Barrett testified Gilbertson volunteered numerous times to fix the discrepancies but they did not allow him on the property because they did not know how he planned to fix the problems. Rachel Barrett testified she did not want to allow Gilbertson to repair any of the defects because she thought his quality of workmanship was poor and the repairs would not improve the quality. The evidence supports the court's finding that Gilbertson's nonperformance was excused because he was never given an opportunity to repair the defects and the Barretts prevented him from complying with the terms of the contract.

[¶ 23] We affirm the district court's finding that the Barretts failed to establish their claim for breach of contract relating to defects in the construction.

IV

[¶ 24] The Barretts argue the court erred in denying their claim for attorney's fees relating to Gilbertson's counterclaim for defamation and emotional distress because the claims were frivolous.

[¶ 25] The Barretts requested attorney's fees under N.D.C.C. § 28–26–01(2), which provides:

In civil actions the court shall, upon a finding that a claim for relief was frivolous, award reasonable actual and statutory costs, including reasonable attorney's fees to the prevailing party. Such costs must be awarded regardless of the good faith of the attorney or party making the claim for relief if there is such a complete absence of actual facts or law that a reasonable person could not have thought a court would render judgment in that person's favor, providing the prevailing party has in responsive pleading alleged the frivolous nature of the claim.

The court must first determine whether a claim is frivolous, and if it is, then the court must award reasonable attorney's fees to the prevailing party. *Wolt v. Wolt*, 2011 ND 170, ¶ 25, 803 N.W.2d 534. The court has discretion in deciding whether a claim is frivolous and in deciding the amount and reasonableness of an award. *Id.* at ¶ 26. The court's decision will not be reversed on appeal unless the court abused its discretion. *Id.* A court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, when the court misinterprets or misapplies the law, or when its decision is not the product of a rational mental process leading to a reasoned determination. *Id.* " 'Frivolous claims are those which have such a complete absence of actual facts or law that a reasonable person could not have expected that a court would render judgment in [that person's] favor.' " *Id.* (quoting *Deacon's Development, LLP v. Lamb*, 2006 ND 172, ¶ 12, 719 N.W.2d 379).

[¶ 26] The district court denied the Barretts' motion, ruling the claim was not frivolous:

The Barretts' request is limited to the fees incurred defending against the defamation counterclaim. That counterclaim was dismissed due primarily to

Gilbertson's failure to comply with the procedural requirements of N.D. Cent. Code § 32–43–03, rather than the merits. Although it was no longer directly at issue, the factual basis for the defamation counterclaim did become evident at trial. In short, I did not award attorney's fees to the Barretts when the counterclaim was initially dismissed as I did not then feel the issue of defamation had been asserted in a frivolous manner. Nothing has since changed that impression.

The court did not abuse its discretion in denying the Barretts' motion.

V

[¶ 27] We conclude the evidence supports the district court's findings on the breach of contract claims and the court did not abuse its discretion in denying the Barretts' claim for attorney's fees. We do not need to address other arguments raised because they are either unnecessary to the decision or are without merit. We affirm the district court's judgment.

[¶ 28] GERALD W. VANDE WALLE, C.J., CAROL RONNING KAPSNER, and MARY MUEHLEN MARING, JJ., concur.

CROTHERS, Justice, concurring specially.

[¶ 29] I agree with the majority decision except Part II, paragraphs 6–13, regarding claims for breach of contract involving the below-grade space and the laundry room dimensions.

[¶ 30] In Part II, paragraphs 14–17, the Court concludes the parties resolved these construction claims by settlement.[1] That settlement makes decision on the construction claims improperly advisory. *See State v. Morin*, 2012 ND 75, ¶ 16, 815 N.W.2d 229 (Crothers, J., concurring specially); and *Sandberg v. American Family Ins. Co.*, 2006 ND 198, ¶¶ 19–21, 722 N.W.2d 359 (Crothers, J., concurring specially).

[¶ 31] Daniel J. Crothers

---

1. The post-settlement warranty claims were not settled, as discussed in Part III at paragraphs 18–23, and remain ripe for our consideration.